COMMODITY FUTURES TRADING COMMISSION, and The State of Michigan, ex rel. Frank J. KELLEY, Attorney General, Plaintiffs,

v.

Barbara A. SKORUPSKAS, Baral Corp., d/b/a Baral Investments, Inc., and Sidereal Corporation, d/b/a Sidereal Investment Corp., Defendants.

No. 83–CV–1885.

United States District Court,
E.D. Michigan, S.D.

March 20, 1985.

Stephen T. Bobo, Commodity Futures Trading Com'n, Chicago, Ill., Joe D. Sutton, Asst. Atty. Gen., State of Mich., Economic Crime Div., Lansing, Mich., for plaintiffs.

Barbara A. Skorupskas, pro per.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PHILIP PRATT, District Judge.

On May 16, 1983, the Commodity Futures Trading Commission ("CTFC") and the State of Michigan[1] filed a complaint against defendants Barbara A. Skorupskas ("Skorupskas"), Baral Corporation, and Sidereal Corporation for alleged violations of the Commodity Exchange Act[2] and CFTC regulations,[3] including fraud. Skorupskas is the principal officer of each of the defendant corporations. The plaintiffs' complaint sought injunctive and other equitable relief. Based upon plaintiffs' complaint and affidavits, a temporary restraining order was entered by the Court. On June 7, 1983, by consent of the parties, the Court entered a preliminary injunctive order.[4] This Order restrained the defendants and all those persons "in active concert or participation with them who received actual notice of this Order" from "directly or indirectly," among other acts, defrauding investors, receiving and dispersing funds, soliciting or accepting any new customer accounts, and dissipating or transferring the assets of defendants. The Order froze the assets of the defendants and authorized the appointment of a temporary receiver to take possession of the assets, to determine the benefits the defendants had gained by their wrongdoing, and to administer the receivership.[5]

On September 22, 1983, the plaintiffs filed an amended complaint which alleged four additional counts of fraud. This amendment was prompted by the initial report of the Receiver which indicated that investor funds were commingled in the accounts of Barbal, Sidereal, and Skorupskas' personal account and that substantial sums had been used by Skorupskas for her personal benefit.

On August 23, 1984, the State of Michigan filed a motion to hold Skorupskas in civil contempt for alleged violations of the preliminary injunctive order of June 7, 1983. The Court granted Skorupskas' motion to separate the contempt proceedings from the case in chief.[6] Accordingly, the Court held a trial concerning the alleged violations of the Commodity Exchange Act as contained in the amended complaint. The trial required two weeks during September of 1984. The Court then scheduled

---

1. Section 6d of the Commodity Exchange Act, 7 U.S.C. § 13a–2 (1980), authorizes the State to bring suit against one of its residents to enforce compliance under the Act.

2. 7 U.S.C. §§ 1–26 (1980 and Supp.1984).

3. 17 C.F.R. §§ 1.1–4.23 (1984).

4. *See infra* notes 22–23 and accompanying text.

5. By agreement of the parties Thomas M. Woods was appointed Temporary Equity Receiver.

6. Skorupskas requested additional time to prepare for the contempt hearing because she indicated that she wished to retain counsel for that purpose. Although she had previously been represented by counsel, Skorupskas chose to represent herself at the trial and the contempt hearing.

additional hearings regarding the allegations of civil contempt for November 26, 1984. On October 25, 1984, the State of Michigan filed a motion seeking an order to show cause why certain individuals, not parties to the action, should not be held in civil contempt for alleged violations of the June 7, 1983 Order. The Court granted this motion and issued the Order To Show Cause. The hearings on the various motions for civil contempt were held November 26–30, 1984, and January 9 and 10, 1985.[7] This Opinion includes the Court's findings of fact and conclusions of law on the merits of the case in chief and on the contempt proceedings.

## I.

The genesis of the scheme was the incorporation in 1981 by Skorupskas and certain relatives of Sidereal Corporation. Based on the alleged phenomenal success that Skorupskas had previously enjoyed in the commodities market, 15 persons opened investment accounts with Skorupskas. They were advised that commodities trading was risky,[8] but also reminded of her allegedly proven ability to make hugh profits. Additionally, Skorupskas advised these investors that profits were not taxable and need not be reported.

The scheme at this point required the investors to execute power of attorney giving Skorupskas complete discretion in trading investor funds in commodities. Skorupskas was to receive a 10% commission on all profits realized. Further, investors executed documents which purportedly would result in the opening of individual accounts with Rouse, Woodstock, Incorporated, a Chicago commodities brokerage firm. The investors were also required to direct Rouse, Woodstock that monthly statements of their account be sent to Skorupskas rather than to them directly. Investors were advised that the Rouse, Woodstock statements would be transmitted to them along with a monthly Sidereal statement of account. Skorupskas directed the investors to make their checks payable to Sidereal. Skorupskas did not indicate that these individuals' funds would be used for any other purpose than commodity investments.

Thereafter, Skorupskas began trading these investor funds through Rouse, Woodstock. After a period of months substantial losses resulted; however, Skorupskas reported to the investors that huge profits were being made, but did not remit to the investors copies of the monthly statements of Rouse, Woodstock which showed the extent of the losses. That may have been the point when the "pyramid" scheme was birthed.[9] Skorupskas expanded her opera-

---

7. The January hearing was necessitated by Thomas J. Gaughan's failure to appear at the November hearings. Gaughan was one of the individuals cited in the Order To Show Cause. Gaughan went to extreme lengths to avoid service of process for hearing on this matter. At the November hearing, testimony established that Gaughan had seen a copy of the Order To Show Cause and had acknowledged that the Order included him. Based upon this testimony and the affidavits of several persons who attempted to serve process on Gaughan, the Court granted the plaintiffs' motion for the issuance of a bench warrant for Gaughan's arrest. In mid-December Gaughan became aware of the U.S. Marshal's efforts in executing the warrant and contacted the Court by phone. Gaughan was in San Diego, California and represented that he did not have sufficient funds to travel to the Eastern District of Michigan. Thus, at the expense of the government, Gaughan was transported to the Eastern District where he was arrested and released on $25,000 personal re-

cognizance bond. The two-day hearing in January concerning Gaughan's alleged wrongdoing was thereafter conducted.

8. Skorupskas' risk disclosure patterned itself after the risk statements of the major brokerage firms. Skorupskas also advised the investors that she would stop trading an account when half the investment was lost. She further suggested that when the accounts showed profits that the investor should withdraw their original investment.

9. Skorupskas utilized a scheme based upon a "pyramid" operation. Skorupskas solicited from individuals funds which were purportedly to be used for commodity trading. She represented that large amounts were earned on these investments (for example, one witness testified that he only invested $2,500 and his last monthly statement indicated a balance of $125,000 which was supposedly gained in less than a two-year period) and utilized these misrepresen-

tions, and through a series of small meetings at her home or the home of her parents (which eventually became the "office" of the Skorupskas interests) and progressively to large meetings of 100 or more persons that were held in rented halls, recruited over 500 new investors. These recruiting sessions were not the result of advertisements or professional promotion, but rather the result of word of mouth communications by her family, personal friends and investors who had been told that they had made large profits in a remarkably short period of time.[10]

It is appropriate at this juncture to describe Skorupskas and her appeal to investors and the consequent blind faith and loyalty to her that not only led to the success of her fraudulent scheme but also caused a significant delay in the prosecution of this case and a disproportionate amount of time and expense necessary for

the Temporary Receiver to perform his functions.

Barbara Skorupskas is an attractive, articulate, and intelligent young woman in her late twenties and is the daughter of Polish immigrants with substantial ties to the Polish community in the area. Many of the family's friends were of like background and were, in the main, of the blue-color class—hard-working, industrious, and rightfully proud of their heritage. The Polish community is closely knit and active. Further, these hard-working people had daily contact in their places of employment with other members of the same class. Apparently the word spread rapidly that there was this amazing young lady who was "one of ours" and who had achieved tremendous success in the esoteric field of stock or commodity investing. Building on that base, Skorupskas was able to capitalize on the frustrations, misconceptions, and aspirations of this amorphous group and

tations in the recruitment of new investors and in soliciting additional funds from those who had already invested. In fact, Skorupskas traded only a small portion of the funds she received and no profits were ever realized. A substantial portion of the funds were disbursed to investors who had requested funds from the "profits" their account reportedly earned. The remainder was distributed to Skorupskas and her family. In short, no investor ever received funds from commodity trading profits, instead, the disbursements were from the funds solicited and obtained from other investors. In this way Skorupskas set in motion a cycle of incoming and outgoing money in which funds would be passed from new investors to old investors with Skorupskas taking a hefty percentage. As long as new money could be obtained to pay supposed "profits," this scheme could continue. If, however, no new money was received then the entire operation would fold.

This pyramid method of operation is not unique. It has been commonly referred to as a "Ponzi" scheme, named after the individual who most notoriously utilized this operation. For instance, in *CFTC v. Chilcott Portfolio Management, Inc.,* 713 F.2d 1477, 1480 (10th Cir.1983) the court considered a scheme similar to Skorupskas' and described it as follows:

Reduced to the simplest terms, a 'Ponzi' scheme attracts investors' monies by falsely reporting generous profits in past transactions and promising more lucrative results in the future. When losses are incurred instead of predicted profits, the program must continue to attract more investments to keep afloat.

The scheme includes paying attractive 'profits' to some investors in order to sustain the appearance of success and increase the attractiveness of the plan to the unwary investors.

10. For example, Walter Osenkowski testified that he invested $9,000 with Skorupskas and that within six months Skorupskas' account statements indicated that he gained $41,000 profit from trading. Kurt Groder testified that he invested $4,000 and that within a matter of months his account statement indicated that his investment had grown to $50,000 less $10,500 he withdrew. Other investors testified that they tendered checks to Skorupskas for investment which were never cashed, yet they received account statements showing tremendous profits and were permitted to withdraw funds.

An illustration of the persuasiveness of Skorupskas' methods can be seen in the instance of the reaction of workers in one section of an automotive manufacturing plant. A worker in the plant was one of the original 15 investors. He mentioned to some of his friends the tremendous "profits" he was earning with the defendant and suggested that they also contact her. These co-workers developed their own group which kept their "secret" about Skorupskas to themselves. Other co-workers at the plant learned of the investment "club" and the large profits which these co-workers were making, however, they were not told who was involved. Eventually, though, many learned about Skorkupskas and her operation and invested substantial sums.

convince many to invest their small savings in her scheme. Her method was masterful, feeding as it did on the innate suspicion and dislike of the wealthy classes, the belief that insiders controlled the market place and reaped huge profits at the expense of the working class, the understandable touch of avarice and the emotions engendered by similar conceptions. Skorupskas was able to sell herself as a Joan of Arc from whom one could be assured of financial security.

Skorupskas at her various meetings told prospective investors that she had developed strategies and techniques of investing which had proved to be infallible; that she wanted to share her knowledge and ability with the little people; that by pooling their individual meager resources through her they could compete with the rich; that she was a member of an "Advisory Group" of experts throughout the world and was in daily telephone and later computer contact with them; that she refused to accept any investment of more than $4,000 and preferably only $2,000 since her purpose was to help the working class; and while mentioning that the risk was great, cleverly emphasizing that huge profits had been realized. In addition, Skorupskas provided these unsophisticated people with impressive formal documents containing, to them, arcane language which persuaded them that this young lady was well educated, astute in areas of high finance and obviously knowledgeable in the investment field. The tape recordings of meetings at which she presented her investment program are fascinating examples of the devices of the successful schemer.[11]

In early 1982, Skorupskas' scheme took root and grew dramatically. She advised potential investors that the most effective method of realizing her and their goals was to pool their respective modest investments. Several pools of between 50 and 300 persons, each investing $2,000 were to be formed. The bulk of the funds would be traded in the commodities market but a small portion might be invested otherwise as a safeguard. Appropriate documents were executed, giving Skorupskas discretionary authority with a 10% commission. Upon payment of the subscribed amount, the investor began receiving monthly statements which reported huge profits. She continued to represent that her programs generated tax-free profits which the investors need not report. These monthly statements were completely false. Not only were there no profits, there was in fact no evidence that any of the pooled funds were ever invested or traded in any commodities market. Instead, Skorupskas, in perpetuating the myth of profits, would use new investor funds to fulfill the request of older investors for withdrawal of some of their supposedly realized profits. Most investors, however, preferred to leave their accounts intact, understandably dreaming of an amazing pot of gold. Along with the utterly fictitious monthly statements, Skorupskas would include a newsletter analyzing the commodities market and containing information regarding other pool investments.[12] These newsletters demonstrate the extent of fabrications Skorupskas contrived to maintain investor confidence. For example, in the newsletter of April of 1983 Skorupskas states:

I would like to address several rumors which I have heard lately:

1. That I no longer have the 5:00 A.M. Conference Call. FALSE! Each of us in our Advisory Group input our information into a computer. We can then each pull information out of

---

11. Investors taped many of these meetings so that those who could not attend would be able to hear the presentations. Many of the investors testified that they would also listen to the tapes again because they had difficulty following the discussion by Skorupskas. These tapes and transcripts of their contents were admitted into evidence at the various hearings. *See, infra,* note 27 and accompanying text.

12. Skorupskas represented that she had diversified investor money into transactions involving gold, silver, jojoba bean property, and Caribbean property. She would represent that she had made arrangements with the Internal Revenue Service for these investments to also be tax free.

the computer before Market hours. It helps those who are in South Africa and Tokyo not to have to keep such odd hours. We still have weekly telephone conversations. What I am saying is, instead of using the expensive telephone system, we now use a computer. This is done to save YOU money.

In the fall of 1982, Skorupskas' operation had grown to the degree that whereas before she had, with the help of her mother, been able to handle the accounts, it was necessary to obtain clerical and secretarial assistance. Two persons were eventually hired, Marcia Lukatch and Cynthia Chowanic, both of whom were critical witnesses at the trial and hearings. More and larger public meetings were held and the false representations and reports were repeated and enlarged upon.

Also in the fall of 1982, Skorupskas began to distribute offering memoranda or prospectuses to current and potential investors. These documents contained information regarding two commodities pools which Skorupskas was offering. Later a performance table was added to these disclosure statements to show Skorupskas' supposed trading record. This performance schedule was the "amalgamat[ion of] the accounts of 15 individual investors managed by [Skorupskas]" for the six-month period of September, 1981, through June, 1982.[13] These schedules reported tremendous trading success within that period, with profits ranging from 15% to 89% quarterly. The offering memoranda also contained various contracts to enable a potential investor to join the various pools. The prospectus was liberally distributed by Skorupskas' family and associates. Skorupskas had many of these prospectuses sent to investors through the mails as well as handed out at the group meetings. Several investors testified that the performance tables influenced their decision to invest.

In early 1983, Skorupskas switched the operation from Sidereal to Baral, a newly formed corporation. She told investors that the change was necessitated by the various commodity pools. She also represented that the structure and operation of the corporation would remain the same and that only the name had changed. Baral did operate in the same fashion. The only change was that monthly statements and newsletters were on Baral letterhead. The emergence of Baral, however, did not extinguish Sidereal. Skorupskas used both corporations for managing the investors' funds.

The change in corporations coincides with the attempts in registering herself and Baral and Sidereal with the CFTC. Between October 4, 1982 and June 30, 1983, Skorupskas was registered with the CFTC as a Commodity Trading Advisor. Skorupskas filed an application on behalf of Baral to be registered as a Commodity Pool Operator on June 21, 1982. After several requests by the CFTC for additional information, Baral became registered as a Pool Operator from October 7, 1982 to June 6, 1983. As is required to become registered, Baral submitted disclosure statements relating to two commodity pools for which it was soliciting investors. These disclosure statements contained the performance table described above. Sidereal was never registered with the CFTC in any capacity.

In April of 1983, the CFTC began to investigate the operations of Skorupskas. Apparently the initial focus of the investigation was to verify the information in the performance tables and the management of the 15 individual accounts. Skorupskas was vacationing in Florida when the CFTC first began its inquiry. Skorupskas phoned her secretary and told her to contact the investors with the original 15 accounts and tell them not to give any information to the CFTC investigators. Skorupskas also asked her secretary to prepare affidavits for these investors which asserted that they had received the Rouse statements regarding their accounts from Sidereal and

---

**13.** *E.g.,* CFTC Exhibit No. 104, "Exhibit A1,"     note 1.

Baral. The affidavits were, of course, false. Nonetheless, the 15 investors were presented with these affidavits and all but one signed.

Skorupskas immediately returned from Florida and frantically began going through the books of the corporations. The CFTC had requested Skorupskas to produce various records as required by law. There was testimony that Skorupskas destroyed and altered many documents to avoid the CFTC's inspection. Skorupskas had agreed to provide the CFTC with all the necessary books at her attorney's office on May 5, 1983. The records presented at that time to the CFTC investigator, however, were markedly incomplete.[14] Skorupskas subsequently continued to resist disclosure of the requested documentation.

On June 7, 1983, based upon the complaint and affidavits filed by the CFTC and the State of Michigan, the parties entered into a consent injunctive order which froze Skorupskas', Baral's, and Sidereal's assets and placed them in receivership.

The Temporary Receiver was charged with gathering and administering the funds and reporting his findings. He made an initial report in the fall of 1983. He supplemented his report at trial. The reports are based on the records of Sidereal and Baral that were produced and documents from various bank accounts and commodity brokerage firms. Due to the incomplete records submitted by Skorupskas, much of this information was gained through the considerable efforts of the Receiver. In fact, half of the Receiver's fees generated to date have been due to Skorupskas' failure to cooperate. The Temporary Receiver's findings were not contradicted in any way at the hearings. Neither Skorupskas nor any other defendants submitted evidence which would challenge the Temporary Receiver's analysis of the assets and transactions of Skorupskas, her family, her corporations, or her associates. Moreover, ample documentation was submitted to support the data in the reports.

The following facts were established at trial.[15] By June 7, 1983 approximately 500 investors had deposited between $2,672,583 to $2,818,683 with Skorupskas in a two year period. Skorupskas had placed $959,943 into accounts at three commodity brokerage firms: Rouse, Woodstock, Garvey Commodities ("Garvey"), and Bache, Halsey, Stuart & Shields ("Bache").

At Rouse, Skorupskas maintained two sets of accounts, those in the name of the fifteen investors and an account in her and her husband's name. She put $111,625 in the accounts of the fifteen investors between September of 1981 to September of 1982. She deposited $463,924 into her and her husband's personal account between September of 1981 and June of 1983. Of these funds $367,000 is directly traceable to investor contributions. Of the $111,635 in the accounts of the fifteen investors, $27,159 was lost trading, $11,309 was withdrawn by wire transfer, and $13,424 was dispensed by checks made payable to cash.

14. The following were not produced for Baral as required of a commodity pool operator: (i) a journal of original entry, 17 C.F.R. § 4.23(a)(2); (ii) a subsidiary ledger, 17 C.F.R. § 4.23(a)(4); (iii) a general ledger, 17 C.F.R. § 4.23(a)(6); (iv) copies of each confirmation of a commodity futures transaction of the pool, each purchase and sale statement and each monthly statement for the pool, 17 C.F.R § 4.23(a)(7); all cancelled checks, bank statements, journals, ledgers, invoices, computer generated records, and all other records maintained in connection with the operation of the pool, 17 C.F.R. § 4.23(a)(8); statements of Financial Condition as of the close of the month, 17 C.F.R. § 4.23(a)(10); and each confirmation of a commodity futures transaction, each purchase and sale statement and each monthly statement furnished by a fu-tures commission merchant, 17 C.F.R. § 4.23(b)(2).

The following was not produced for Sidereal but requested by the investigator: (i) account statements issued to commodity customers; (ii) account statements for any accounts in the name of Sidereal; and (iii) general corporate records including ledgers, journals, check registers, and financial statements.

15. These facts are based on the testimony of the Temporary Receiver, Gary Sandahl, an auditor with the CFTC, James Andreozzi, a Futures Trading Specialist, Charlotte Ohlmiller, also a Futures Trading Specialist, and Allen Swormstedt, a Certified Public Accountant.

This left $57,728 in the account at the commencement of the receivership. As to the Skorupskas' personal account at Rouse, $227,578 was lost in trading; $63,800 was transferred by wire to the Skorupskas' personal bank account and $22,700 was transferred to Sidereal/Baral bank accounts. One Hundred Forty-Nine Thousand, Eight Hundred Forty-Six Dollars ($149,846) remained in the account at the time of the receivership.

The Bache account was active from January to December of 1981 and consisted of $106,973 of investor contributions and $14,-345 from Sidereal bank accounts. In this account $62,022 was lost in trading, $46,019 went to unknown payees, and $20,000 was transferred into the Skorupskas' personal account at Rouse.

In total Skorupskas lost $560,132 in trading as of May of 1983. She nevertheless represented to investors that $3,754,052 had been realized in trading profits. There is no record of her ever making a profit even in the short-term by trading. In fact many of her transactions could only result in losses. For example, in the Garvey account in April and May of 1983, the account had both long and short positions in gold futures for delivery in June of 1983. Opposite positions in the same delivery month of the same futures account results in each position offsetting any gain in the other. Thus, Skorupskas had locked in substantial loses by such trading. Thomas Gaughan was the account executive for the Garvey account during this period and he attempted to explain this trading strategy at his hearing. His explanation did not warrant this method of trading. In fact, there is no economic justification for holding such opposite open positions. The only result of such trading is to lock in losses and permit Gaughan to gain additional commissions.[16]

In sum, then, of the $2,672,583 to $2,818,-683 which Skorupskas obtained from inves-tors, over $800,000 was disbursed to investors, $560,132 was lost in trading, roughly $800,000 went to Skorupskas, her family, and unidentified expenses, leaving funds totalling $500,405 for the receivership. These figures establish the pyramid nature of the scheme. Over $800,000 of invested funds were not used for trading, but rather were used to pay the investors who made a request to cash in some of their alleged profits. Another $800,000 went to Skorupskas and her family for unknown and unidentified purposes.

The following is a summary of these figures:

| | As of June, 1983 |
|---|---|
| Total Investors Deposits | $2,672,583—$2,818,633 |
| Amount Placed With Trading Houses | 959,943 |
| Amount Lost Trading | 560,132 |
| Amount Disbursed Back to Investors | (over) 800,000 |
| Amount to Skorupskas and Her Family | (over) 800,000 |
| Amount Remaining (Funds composing receivership) | 500,405 |
| Amount Represented by Skorupskas as Trading Profits | 3,754,052 |

The $800,000 Skorupskas distributed to herself, her family and for unidentified expenses is particularly revealing of the depth of the fraud. Skorupskas gave $258,753 of investor contributions to her immediate family. Eugene and Milda Skorupskas, Skorupskas' brother and sister-in-law, received approximately $115,550 based on an investment of $4,000.[17] Skorupskas' parents, Johannes and Krystyna Kliczak, received at least $89,473 on a purported $4,000 investment. Stasys Skorupskas, Skorupskas' father-in-law, received $19,380. He claims to have invested $6,000 but this was not verified by the documentation. Andre Kliczak, Skorupskas' brother, received $34,350 without investing any mon-

16. The Garvey and Rouse accounts were liquidated on May 17 and 18 of 1983 due to the efforts of the CFTC. If they had been held open, as was Skorupskas' intent, until June 3rd, the accounts would have lost an additional $405,000.

17. The Skorupskas claimed they actually invested $70,000, but only $4,000 was verified by documentation.

**932**

ey.[18] Skorupskas placed into her and her husband's personal banking accounts at least $200,640 of investor contributions, which Skorupskas used for her own purposes. For example, Skorupskas purchased an expensive Mercedes Benz automobile. The remaining $380,509 was distributed for unidentified expenses. The testimony and documentation suggests that a substantial portion of these funds were probably expended for Skorupskas' personal use.

## II.

■ There can be no doubt that Skorupskas' activities between the fall of 1981 and June of 1983 violated several provisions of the Commodity Exchange Act. Foremost Skorupskas and her operation violated the antifraud provisions of the Act. Section 4*o* of the Act, 7 U.S.C. § 6*o* (1), provides:

(1) It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(A) to employ any device, scheme, or artifice to defraud any client or prospective client or participant; or

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

Although Skorupskas was never registered as a commodity pool operator Section 4*o* (1) applied to her activity because Section 2(a), 7 U.S.C. § 2, provides that as used in the Act:

[t]he term "commodity pool operator" shall mean any person engaged in a business which is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity for future delivery on or subject to the rules of any contract market ...

Section 4b(A), 7 U.S.C. § 6b(A), prohibits any person, in connection with futures commodity contracts, "made, or to be made" on behalf of other persons, from "cheat[ing] or defraud[ing] or attempt[ing] to cheat or defraud such other persons." Skorupskas violated these provisions in three ways.

First, Skorupskas' misappropriation of customers' funds which had been entrusted to her for trading purposes is a violation of both §§ 4b(A) and 4*o* (1).[19] Skorupskas defrauded customers by soliciting investors' funds for commodity trading and not trading those funds. Only a small percentage of the investors' contributions were traded. Skorupskas only opened trading accounts in her and her husband and the original fifteen investors' names. She never opened commodity pool accounts although she solicited several hundred thousand dollars for such pools. Instead, she disbursed the investor funds to other investors, to herself, and to her family. This conduct is clearly prohibited by the Act.

Second, Skorupskas also violated sections 4b(A) and 4*o* (1) by issuing false monthly

---

**18.** At the September trial Skorupskas asked for additional time to procure from various banks documentation to prove that Andre Kliczak had invested $10,000. The Court granted this request and Skorupskas represented to the Court that she would produce these documents in a matter of weeks. Skorupskas has yet to submit any documentation in this regard. It is highly doubtful that such documentation actually exists.

**19.** *See Leist v. Simplot,* 638 F.2d 283 (2nd Cir. 1980), *aff'd,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982); *CFTC v. Savage,* 611 F.2d 270 (9th Cir.1979); *CFTC v. Payne Commodities Corp.,* 502 F.Supp. 194 (S.D.N.Y.1980), *aff'd,* 681 F.2d 801 (2nd Cir.1981); *CFTC v. U.S. Metals Depository Co.,* 468 F.Supp. 1149 (S.D.N.Y.1979); *In re Hardwick & Wells Commodities, Inc.,* [1982–84 Transfer Binder] Comm.Fut.L.Rep. (CCH) 22,001 (Summary disposition, February 10, 1984); *CFTC v. Carnagey,* No. 82–44 (Slip Opinion, N.D.Okla., Nov. 7, 1983).

statements to customers. Skorupskas through Baral and Sidereal sent monthly account statements to all her investors for both the individual accounts and the alleged "pool" accounts. These statements purported to show the account balance of each investor. Uniformly these statements would indicate large trading profits when Skorupskas made no such profits trading, and had only suffered losses.

The third activity of Skorupskas which violated the antifraud provisions of the Act was the inclusion of and solicitation with deceitful performance tables in the disclosure document for Baral's Commodity Futures Fund Series I. Courts have recognized that the failure to disclose information that a performance record does not represent the results of actual trading but of hypothetical or fictitious trading is a violation of section 4o(1).[20] In the description of the performance tables Skorupskas stated that the table summarized the actual trading performance of fifteen accounts. This representation was false. The table does not reflect any trading either done by or under the advice of Skorupskas. Not only does this misrepresentation violate section 4o(1) but Skorupskas filed these fraudulent performance tables with the Commission and distributed to investors by mail as well as in person. Investors relied upon the performance tables in originally deciding to invest and to continue investing with Skorupskas and her corporations. This activity also violates sections 4b(A) and 4o(1) of the Act.[21]

Furthermore, Skorupskas violated section 4d(1) of the Act, 7 U.S.C. § 6d, by acting as a futures commission merchant without proper registration. Section 4d(1) provides in pertinent part:

It shall be unlawful for any person to engage as a futures commission merchant or introducing broker in soliciting orders or accepting orders for the purchase or sale of any commodity for future delivery, or involving any contracts of sale of any commodity for future delivery, on or subject to the rules of any contract market unless—

(1) such person shall have registered under this chapter, with the Commission as such futures commission merchant or introducing broker ....

Section 2(a)(1) of the Act, 7 U.S.C. § 2, defines futures commission merchant as: the solicitation and acceptance of orders, and the acceptance of money, securities, or property. The courts have also recognized that the solicitation of discretionary trading authorizations and powers of attorney are within the definition of solicitation and acceptance of "orders" under section 2(a)(1). E.g., In re Investors International, Inc., [1980–82 Transfer Binder] Comm.Fut.L. Rep. (CCH) # 21,068 (Initial Decision, April 24, 1980), aff'd, [1980–82 Transfer Binder] Comm.Fut.L.Rep. (CCH) # 21,248 (CFTC, September 17, 1981). Skorupskas acted as a futures commission merchant with regard to the fifteen individual investors by managing these investors' accounts at Rouse, Woodstock, having the investors sign opening account documents and powers of attorney, having the investors contribute directly to Sidereal, and disbursing funds through Sidereal to Rouse with directions from Skorupskas as to how to allocate the funds. Hence, her failure to register herself and her corporations violated the Act.

Finally, Skorupskas violated section 4n(3) of the Act, 7 U.S.C. § 6n(3), and Commission regulations 1.31 and 4.23, 17 C.F.R. §§ 1.31 and 4.23 (1983), by failing to make, keep and make available required books and records. Section 4n(3) requires a commodity pool operator or one who acts as

---

**20.** E.g., Sztaba v. First Commodity Corp. of Boston, [1977–80 Transfer Binder] Comm.Fut.L. Rep. (CCH) # 20,789 (March 12, 1979). See Maynard v. Cycle System Index, Inc., [1980–82 Transfer Binder] Comm.Fut.L.Rep. (CCH) # 21,-429 (April 20, 1982); Parciasepe v. Shearson Hayden Stone, Inc., [1980–82 Transfer Binder] Comm.Fut.L.Rep. (CCH) # 21,461 (August 18, 1982).

**21.** Skorupskas' conduct regarding the performance tables similarly is in violation of CFTC regulations 4.21(a) and 4.41(b), 17 C.F.R. §§ 4.21(a) and 4.41(b).

one to maintain books and records prescribed by the Commission. The Commission regulations require a commodity pool operator to make and keep all of the books and records described in regulation 4.23 in an accurate, current, and orderly manner at its main business office. *See* 17 C.F.R. §§ 1.31 and 4.23 (1983). The regulations further require that the records must be kept for five years and be open to inspection by representatives of the CFTC. *Id.* § 1.31. Skorupskas has failed to and continues to fail to make the necessary records available to the Temporary Receiver or the CFTC agents as she was required.

## III.

On August 23, 1984, the plaintiffs filed a motion for an order holding Skorupskas in contempt of the June 7, 1983 Order of Preliminary Injunction. On October 25, 1984, per plaintiffs' motion, the Court issued an order to show cause why certain individuals should not be held in contempt of the June 7th Order. Those individuals were Cynthia Chowanic, Thomas J. Gaughan, Rose Groder, Andre Kliczak, Skorupskas' brother, Krystyna and Johannes Kliczak, Skorupskas' parents, and Algis Skorupskas, her husband. The hearings on these matters were conducted on November 26–30, 1984, and January 9 and 10, 1985.[22]

The June 7th Order provides that Skorupskas, Baral, Sidereal, and their "affiliates, agents, servants, employees, successors ... and persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise ..." are restrained "from directly or indirectly": (i) "[d]issipating, withdrawing, transferring, removing, concealing or disposing of funds, assets or other property of defendants, whether held in the name of the defendants or otherwise ..."; (ii) "[d]estroying, mutilating, concealing, altering, or disposing of, in any manner, any

of the books, records, documents, correspondence ... or other property of the defendants ..."; (iii) "soliciting or accepting any new customers' accounts or any new deposits of funds from existing customers ..."; (iv) "directing or causing to be executed trades or contracts on behalf of their customers"; (v) "transferring, receiving, changing, selling, pledging, assigning or otherwise disposing of or withdrawing any funds, property, premises and other assets of defendants"; and (vi) acting in violation of the antifraud provisions of the Commodity Exchange Act.

The Order also provided for the appointment of a Temporary Receiver. By agreement of Skorupskas and the plaintiffs, Thomas M. Woods was appointed Temporary Equity Receiver. The Order required all persons to deliver to the Receiver "all funds, property, premises and other assets of or in the possession or control of the defendants ..." This command not only included all of the defendants' bank accounts but also the 1982 Mercedes and a Saab that Skorupskas purchased. The Order authorized the Receiver to "take immediate possession, custody and control of all funds, property, premises, and other assets of defendants." The Receiver was charged with the duty of determining all benefits received by defendants "derived, directly or indirectly, from acts and practices which constituted violations of the [Commodity Exchange] Act ..."

Although the Court's June 7th Order was entered by agreement of the parties, Skorupskas immediately and extensively acted in contempt of that Order. Not only is the evidence of Skorupskas' contemptuous conduct overwhelming, but Skorupskas admitted her wrongdoing at the hearing and did not offer any defense to the accusations.

■ Shortly after the Order was filed, Skorupskas began a series of activities in contravention of the Court Order.[23] Skorups-

---

**22.** *See supra* note 7 and accompanying text.

**23.** The Receiver permitted Skorupskas to retain possession of the Mercedes for her own personal use. Immediately after the Order was entered, Skorupskas used the automobile as collateral for a loan, in violation of the Order, which resulted in a $9,000 lien on the automobile. Further, Skorupskas directed her employee to

kas established an organization which permitted her to continue to operate in the same manner as before the lawsuit and the Court Order. Initially, Skorupskas made it known that the Receiver possessed only a portion of the funds. Skorupskas represented that nine million dollars existed in "off shore" accounts and were still earning profits for all the investors. Her parents represented that these funds amounted to nineteen million dollars. No evidence was presented at trial which would suggest that such funds do indeed exist. Almost every witness who testified at the various hearings was asked if they knew of any "off shore" funds. Uniformly the witnesses stated that their only knowledge was derived from Skorupskas' representations and that they knew of no corroborating facts. In fact, not one witness could even name the country or countries where these funds were supposed to be deposited. Even the two witnesses who worked as secretaries for Skorupskas on a daily basis after the entry of the Court Order and had access to much of the files and documents testified that there were no documents or other evidence of any kind which substantiated that there were any overseas accounts.

This representation was useful for Skorupskas for a number of reasons. First, the existence of "off shore" funds unbeknownst to the Receiver would explain any findings by the Receiver that Skorupskas had actually lost money trading and that there was no money to support the profits she had been reporting to investors. Second, and more importantly, the investors' belief in the "off shore" funds permitted Skorupskas to continue her "pyramid" operation.

Within a month after the June 7th Order was entered Skorupskas had established operations in the basement of her parents' house. She hired two secretaries to handle certain secretarial and bookkeeping functions as well as to disseminate information to investors. Krystyna Kliczak also worked extensively with Skorupskas in

travel to Chicago and sell certain gold coins

these activities. Skorupskas organized the investors into "investment clubs" composed of no more than fifteen individuals. These clubs were designed to circumvent the Court Order and enable her to continue her enterprise. Investors were sent partnership agreements and other documents to form these clubs. Forty-seven groups were established. Each group had an individual designated as a "group leader" who acted as a liaison between Skorupskas and the club members. These group leaders worked closely with Skorupskas and frequently met with her. The group leaders passed on information from Skorupskas and her secretaries to the club members. For example, Skorupskas, through her staff, continued to inform investors of their supposed monthly balance in their accounts. Apparently this was primarily accomplished by phone. Some investors received monthly reports as late as November of 1984.

Through the group leaders Skorupskas also conveyed false and misleading information about the Court Order and the freezing of her assets. Commencing in June of 1983, the Court Order was made known to the investors and the topic of much discussion. Based upon their deep faith in Skorupskas, investors generally supported Skorupskas and maintained their belief in her integrity.

Andre Kliczak lives in Wisconsin and headed operations in that area. Several individuals had invested with Skorupskas before the Court Order and several more joined due to Andre's solicitations. Andre acted as a "group leader" for the entire region, passing along information from his sister as well as mailing a newsletter to Wisconsin investors which contained several misrepresentations about the investment of funds, the disposition of this lawsuit, the Receiver, the CFTC attorneys, and the Court. After the Court Order, through Andre, new funds were received and purported "profits" distributed to these Wisconsin investors.

which were to be part of the receivership.

Under this modified system Skorupskas maintained the same method of taking in monies from investors and distributing the funds back to investors as "profits" [24] as well as skimming a healthy amount for her and her families' personal use. Skorupskas ceased operating under the corporate names of Sidereal and Baral and instead used such entities as "Commodity International Advisor" and "Research Institute" or "Universal Research Institute." Investors were told to make their checks for contributions payable to these organizations.

Skorupskas directed several individuals to open bank accounts in various banks for "Commodity International Advisor" and "Research Institute." Skorupskas also instructed them to open accounts in their own names. These individuals were Algis Skorupskas, Skorupskas' parents, Lukatch, Thomas Gaughan, and Thomas Gaughan's mother. Skorupskas was also signatory to some of these accounts using her maiden name. Twelve bank accounts were opened in all. These bank accounts were composed of funds contributed by new investors or previous investors who wished to add to their accounts. Hundreds of thousands of dollars passed through these accounts beginning in the summer of 1983 and continuing through the fall of 1984. In total, over $700,000 was deposited into these accounts with over $500,000 directly traceable to investor contributions, while over $100,000 came from unidentified sources. Approximately $308,000 was disbursed to investors with the remaining sums going to Skorupskas, her family, and Thomas Gaughan.

The following table summarizes the activities in these accounts.[25]

| Bank | Names on Signature Cards | Period | Amount Deposited |
|---|---|---|---|
| State Bank of Fraser | Algis Skorupskas | 6/2/83—7/18/83 | $70,000 |
| | (Amount to investors: | $48,000) | |
| | (Amount to Skorupskas, her family, associates and unidentified expenses: | $22,000) | |
| Comerica Bank | Johannes Kliczak | 7/5/83—8/23/83 | $11,000 |
| | (Amount to investors: | $     0) | |
| | (Amount to Skorupskas, her family, associates, and unidentified expenses: | $11,000) | |
| Manufacturers National Bank | Krystyna Kliczak | 7/5/83—9/16/83 | $11,000 |
| | (Amount to investors: | $1,600) | |
| | (Amount to Skorupskas, her family, associates, and unidentified expenses: | $9,400) | |

24. For example, Ms. Lukatch who worked as a secretary for Skorupskas testified that in the summer of 1983 Skorupskas directed her to cash a $50,000 check which was received as an investment. Skorupskas then directed Ms. Lukatch to give the cash to a Mr. Jackow who desired to withdraw his "profits" for a closing on a house. Lukatch testified that on the day of the closing Jackow came to the Skorupskas office in the Kliczak home and Lukatch and an associate stuffed Jackow's pockets with approximately $56,000 worth of cash which was supposed to be invested in commodities.

25. The figures are rounded-off.

| Bank | Names on Signature Cards | Period | Amount Deposited |
|------|--------------------------|--------|------------------|
| Manufacturers National Bank | Krystyna Kliczak<br>Marcia Lukatch | 7/5/83—8/23/83 | $12,000 |
| | (Amount to investors: | $4,000) | |
| | (Amount to Skorupskas, her family, associates, and unidentified expenses: | $8,000) | |
| National Bank of Detroit | Algis Skorupskas | 7/13/83—9/16/83 | $41,000 |
| | (Amount to investors: | $7,000) | |
| | (Amount to Skorupskas, her family, associates, and unidentified expenses: | $34,000) | |
| | ($25,000 to Skorupskas's attorney Irwin Alterman) | | |
| Manufacturers National Bank | Krystyna Kliczak<br>Marcia Lukatch | 7/22/83—8/23/83 | $33,000 |
| | (Amount to investors: | $32,000) | |
| | (Amount to Skorupskas, her family, associates, and unidentified expenses: | $1,000) | |
| Liberty State Bank | Krystyna Kliczak<br>Marcia Lukatch | 7/26/83—12/5/83 | $247,000 |
| | (d/b/a "Commodity International Advisor") | | |
| | (Amount to investors: | $      0) | |
| | (Amount to Skorupskas, her family, associates, and unidentified expenses: | $247,000) | |
| | ($39,000 deposited in other bank accounts) | | |
| Pacific National Bank | Dorothy Gaughan<br>(d/b/a "Research Institute Development") | 11/23/83—10/2/84 | $50,000 |
| | (Amount to investors: | $14,000) | |
| | (Amount to Skorupskas, her family, associates, and unidentified expenses: | $36,000) | |
| Comerica Bank | Krystyna Kliczak | 12/21/83—1/25/84 | $19,000 |
| | (Amount of investors: | $ 6,500) | |
| | (Amount to Skorupskas, her family, associates, and unidentified expenses: | $12,500) | |

| Bank | Names on Signature Cards | Period | Amount Deposited |
|---|---|---|---|
| Liberty State Bank | Krystyna Kliczak | 1/25/84— present | $25,000 |
| | (Amount to investors: $16,000) | | |
| | (Amount to Skorupskas, her family, associates, and un-identified expenses: $ 9,000) | | |
| Peoples State Bank | Krystyna Kliczak Johannes Kliczak Barbara Kliczak and Thomas Gaughan | 2/6/84—5/29/84 | $200,000 |
| | (Amount to investors: $50,000) | | |
| | (Amount to Skorupskas, her family, associates, and un-identified expenses: $150,000) | | |
| State Bank of Fraser | Krystyna Kliczak Johannes Kliczak | 6/7/83—9/15/84 | $98,000 |
| | (Amount to investors: $12,000) | | |
| | (Amount to Skorupskas, her family, associates and uniden-tified expenses: $86,000) | | |

Commodity trading was not the only investment for which Skorupskas solicited new funds. With the aid of Gaughan, Skorupskas developed two other investment ploys to solicit further funds.[26] Although some details of these "investment opportunities" were provided in Skorupskas' newsletter and through group leaders, the primary vehicle used to convey these schemes to investors was through group meetings at rented halls. The Court received into evidence several tape recordings investors made of these meetings.[27] The principal speakers at these meetings were Skorupskas and Gaughan, although others did make presentations including Andre Kliczak. Two principal investment "opportunities" were explained to the investors.

The first project was entitled the "Pioneer Inn." Skorupskas and Gaughan detailed at the group meetings their[28] plan to buy the Pioneer Inn in Hawaii[29] for below the market price. The Pioneer Inn is an historic hotel which also has several shops and offices connected with it. Skorupskas, Gaughan, and Stewart Frank, who purported to be an accountant for the firm handling the rental of the Pioneer Inn, told investors that the current owners undervalued the worth of the hotel and had established rents for the shops and offices far below the market price. According to Gaughan and Skorupskas, since the current owners underestimated the profitability of the hotel they also underestimated its market value. Gaughan represented to investors that they were very close to buying

26. In the spring of 1983 Gaughan was no longer employed by Garvey and began being substantially involved in Skorupskas' operation in Michigan.

27. *See supra* note 11.

28. At the hearing Gaughan testified that he was not really involved in the Pioneer Inn and that he was only relating information which Skorupskas had told him. His presentations at the group meetings do not corroborate his asserted lack of knowledge. Gaughan spoke at great length and in great detail about the Pioneer Inn.

Several investors asked him questions concerning this project and he readily offered an answer without deferring to or consulting Skorupskas. Gaughan's testimony about his minimal involvement in this project is wholly inconsistent with his presentations at the group meetings and the testimony of other witnesses. He may not have been originally responsible for the Pioneer Inn project, but he was certainly instrumental in the solicitation of funds.

29. The Pioneer Inn is located in Lahaina, Maui.

the hotel from the owner. Moreover, Skorupskas represented that a certain amount of money had to be collected by a certain date in order to secure the deal. These funds were to be raised by new contributions and from "transfers" from investors' accounts from the "off shore" funds. Several hundred thousand dollars in new contributions and "transfers" were raised for this project.

Despite Skorupskas' and Gaughan's intricate and detailed description of the Pioneer Inn and the business dealings concerning its sale, not surprisingly, these representations were false. The managing partner of the partnership which owns the property testified that there were never serious negotiations to sell the hotel to anyone and that he had not even had casual discussions with anyone representing Skorupskas regarding the sale of the hotel. The "Pioneer Inn" project was nothing more than another scheme to secure more money from investors to keep Skorupskas' operations going. This solicitation by Skorupskas and Gaughan was fraudulent and in contravention of the Court's Order.

The second project proposed by Skorupskas and Gaughan was equally deceitful. Unlike the "Pioneer Inn," this second scheme appears to have been originated by Gaughan. Gaughan called this "investment opportunity" the "Hong Kong Venture." Without belaboring the details, Gaughan represented to investors that there was sizeable investment opportunity in establishing a firm which would relocate Hong Kong businessmen and their capital before Hong Kong is to be returned to China by Great Britain. He stated that he had met with various individuals from Hong Kong and other countries and boasted of the feasibility of such an operation. He told investors that he had established a corporation in Hong Kong for this purpose and had an office and a secretary. He also informed investors that he met with the heads of state of various Caribbean coun-

tries as well as with representatives of this country's Department of Commerce. Investor funds were needed, according to Gaughan, to maintain the office, for development and research, and for travel and various other expenses. His pitch was that Hong Kong businessmen would utilize the firm's resources to invest in and relocate businesses primarily in the Caribbean basin and to obtain citizenship in such countries in return for their investment. The anticipated return of Hong Kong to China, he explained, would prompt many Hong Kong businessmen to leave Hong Kong and seek personal and financial security in tropical countries which were seeking foreign investments. Investors were again told to contribute to this project with additional contribution or by "transferring" money from their "off shore" account. Although this project did not interest investors as much as the Pioneer Inn, investors still contributed a sizeable sum in both new investments.

Despite Gaughan's use of over $10,000 of investor contributions to travel to various locations, the "Hong Kong" project was nothing more than a fabrication and another scheme to defraud investors. Gaughan admitted at the hearing that none of the arrangements which he represented to investors as being accomplished had actually been.[30] Clearly both Skorupskas and Gaughan acted in violation of this Court's order by both soliciting and accepting funds for this project.

The presentations of Skorupskas and Gaughan at these group meetings is also significant because of their discussions of this case and the Court's Order. Both Gaughan and Skorupskas spoke at great length about the progress of this case, the freeze of Skorupskas' assets and the Court Order. These discussions reveal that both Skorupskas and Gaughan understood the Court Order and that they were acting in contempt of the Order. Gaughan's knowledge of the Court Order is particularly signifi-

---

**30.** Gaughan testified that he was only announcing his proposed plans and activities, not what he had actually accomplished. His statements to investors, however, clearly were not in terms of what he planned to do but what he actually had done.

cant since he was never served with a copy of the June 7th Order. Beyond doubt, however, it is obvious from his representations at the group meetings that he was very knowledgeable about the proceedings of this case and the extent of the Court Order. In fact, Gaughan spent much time expounding his line by line interpretation of court pleadings and court opinions in the large group meetings. This tactic Skorupskas also employed to marshall disrespect of the Receiver, the government attorneys, and the Court in order to maintain investor loyalty and faith in Skorupskas, Gaughan and their operations.

Further, Skorupskas and Gaughan persuaded investors to be uncooperative with the Receiver and the government. Because of the incompleteness and disarray of the books Skorupskas turned over to the Receiver, it was necessary for the Receiver to send a questionnaire to investors to determine the amounts they had contributed and received. In the group meetings and through the group leaders, Skorupskas and Gaughan told investors not to complete the Receiver's form but to fill out and send to the Receiver a questionnaire that they had prepared. Unlike the Receiver's questionnaire this form asked the investor if he/she still supported Skorupskas, whether the investor was "happy" with his/her investment and would "like everything to return as it was prior to the government's inter-

ference," and whether the investor was willing to testify in Skorupskas' behalf at trial. Skorupskas encouraged investors to also write their personal comments on this form as to their views of the case, the Receiver, and the government's involvement. Only a handful of the investors returned the proper questionnaire to the Receiver. The vast majority either sent Skorupskas' version of the questionnaire to the Receiver or simply did not bother to respond.

Skorupskas also organized several post card writing campaigns. Skorupskas had her staff prepare post cards addressed to this Court and to the Receiver which were to reflect the investors' position on a certain issue pending before the Court. For instance, the Court received hundreds of these post cards requesting the Court to terminate the proceedings immediately or to demand that the parties settle the case. Skorupskas would have these cards prepared and distribute them at group meetings for signatures and then have her staff mail them. The volume of these cards and the emotional intensity of the investors' personal comments on the questionnaires demonstrated that Skorupskas maintained a very strong and large following.[31]

In early 1948 Gaughan proposed the idea of a cruise with group leaders and other investors to facilitate the solicitation of funds for both the Pioneer Inn and Hong

---

**31.** Gaughan was also instrumental in certain tactics designed to demonstrate popular support for Skorupskas and to hinder the government's prosecution of this case. First, Gaughan drafted affidavits for investors' signatures which attempted to persuade the Court that the CFTC was acting improperly and that Skorupskas had done nothing wrong. These affidavits purported to be in support of settling this case but are really in the nature of legal argument. These affidavits reveal that Gaughan had extensive knowledge of these proceedings and that he had some understanding of legal practice.

Furthermore, Gaughan wrote or substantially contributed to the pleadings in two ancillary proceedings. The first was a motion to intervene. Skorupskas and Gaughan persuaded several investors to seek intervention in this lawsuit. Skorupskas selected and paid for the counsel to represent these individuals while Gaughan structured the pleadings. As one

might expect, the pleadings asserted that these investors should be allowed to intervene because the government did not represent their interests. The Court denied this motion ruling that the interests of the intervenors were adequately represented by the government parties.

The second proceeding was an ancillary action to this case. Skorupskas with Gaughan's help had several investors bring an action against the CFTC attorneys for damages. The complaint alleged that due to the pull out of all of Skorupskas' trading positions because of the freeze and Court Order the investors lost over $800,000. The theory of this loss was developed by Gaughan and was completely incorrect. Expert testimony at trial demonstrated that the investors would have suffered substantial losses if Skorupskas' accounts had not been closed. *See supra* note 16 and accompanying text. The Court dismissed this lawsuit based upon well established principles of government immunity.

Kong projects. Several witnesses testified and Gaughan admitted at trial, that it was Gaughan's position that if investors signed papers and contributed funds in international waters that this activity was outside the jurisdiction of the Court and the CFTC and was not covered by the Court Order. Hence, in March of 1984, Skorupskas, Gaughan, the group leaders, and several other investors went on a cruise in the Caribbean. The money for the cruise came from the bank account of "Research Institute of California," an entity created by Skorupskas and Gaughan. That account consisted entirely of investor contributions. Skorupskas, her family, Gaughan, and several individuals who were supposed to be involved in the Hong Kong project as well as all the group leaders had their trips paid for from this fund. The amount of investor funds used for this cruise totalled over $61,000.

In preparation for the trip, group leaders were told to contact their groups and circulate various documents to encourage an investment in the Hong Kong or Pioneer Inn projects. On the cruise presentations were made by Skorupskas, Gaughan, and other individuals regarding these projects. When the ship reached the twelve-mile limit of United States waters the group leaders and investors executed various documents which purported to make them investors in these projects. Gaughan and Skorupskas told investors that these documents would be flown some place overseas to ensure that the transactions remained outside the jurisdiction of the Court and the CFTC. Not surprisingly, these papers were never sent overseas but were stored in the Kliczaks' basement.

Beyond doubt Skorupskas with the aid of her parents, Gaughan and other associates maintained her pyramid operation up until the November hearing. These activities clearly are in contravention of the Court Order.

## IV.

Of the individuals the plaintiffs sought to hold in contempt of court only two, Andre

Kliczak and Gaughan, offered a defense requiring comment.

Andre Kliczak appeared for the first day of the hearing to show cause why he should not be held in contempt. Kliczak was not represented by counsel and the Court informed him as to the nature and seriousness of the proceedings. Kliczak did not appear thereafter. Instead the Court received a letter from Kliczak which presumably was to serve as an explanation or defense to the allegations of contempt. In this letter Kliczak admits that he acted in contempt of the June 7th Order. He asserts, however, that he had not been "aware of the gravity of it because for some time, I never saw, what I believed to be a complete copy of it until the deposition I gave with Mr. Bobo, the date of which I don't recall." In essence he argues that he was not aware that the Court Order prohibited his activity as a group leader until his deposition when he was shown a copy of the Order. He further argues that at the time he became aware that the Order prohibited his activity he ceased being a participant in his sister's operation.

■ The evidence does not sustain Kliczak's contentions. First, Kliczak's letters to his sister and other investors as well as the testimony of investors demonstrates that he was well aware before his deposition that the Court Order prohibited his activity. Moreover, several letters from Kliczak and other investors reveal that Kliczak continued to act as a liaison for the Wisconsin investors by instructing them on investing and withdrawing funds. In short, the assertions in Kliczak's letter to the Court are not credible and it is certain that Kliczak acted contemptuously with full knowledge of the Court Order.

Thomas Gaughan represented himself at his contempt hearing [32] and testified on his own behalf. His testimony and defense were completely beyond belief. Not only did Gaughan contradict himself several times in his testimony, but his explanations

---

**32.** *See supra* note 9 and accompanying text.

for his behavior were wholly inadequate. Gaughan appeared to be under the misconception that as long as he denied the extent of his involvement, no matter how absurd or outrageous his explanation of his activities, the Court was required to accept it.

■ The thrust of Gaughan's defense was that he just did and said what Skorupskas told him and that he was not aware that he acted in violation of the Court Order. Gaughan is well educated with substantial exposure to government regulations of the commodity market. He spoke at length in group meetings about the Court Order and was instrumental in developing schemes such as the cruise to circumvent the Order. In view of all the evidence concerning Gaughan's statements and actions, his denial of ever seeing the June 7th order is ridiculous.

It is indeed ironic that Gaughan should assert that he just did and said what Skorupskas told him. In many of the presentations he made to investors he criticized the plaintiffs for bringing this action and for asserting that Skorupskas had "possessed mystical powers" over the investors. The evidence clearly establishes that Gaughan was not under the "mystical powers" of Skorupskas, but did in fact mastermind much of the contemptous activity. He aided Skorupskas in soliciting additional funds from investors with fictitious investment schemes and used these funds for his own personal purposes. His presentations at the various group meetings were instrumental in the successful and deceitful solicitation of investors. There can be no doubt that he willfully and extensively acted in contempt of the Court Order.

■ As for the remaining individuals the plaintiffs sought to hold in contempt, the evidence establishes that all of these individuals acted in contempt of the Court Order to a certain extent. However, it appears that only Skorupskas' parents and and her husband acted knowing that their activity was prohibited. Cynthia Chowanic and Rose Groder did not appear to have had knowledge that their actions, which were under Skorupskas' direction, were in contempt of the Court Order.

## V.

As to remedies, there are two kinds of wrongful conduct which must be addressed: first, Skorupskas' violations of the Commodity Exchange Act; and second, Skorupskas' and the other individuals' conduct in contempt of the June 7th Order.

The plaintiffs have requested the following remedies for Skorupskas' violation of the Act: (i) that a permanent injunction be entered; (ii) that the Court order disgorgement and restitution; and (iii) that a permanent equity receiver be appointed.

■ First, section 6c of the Act, 7 U.S.C. § 13a–1 provides:

Whenever it shall appear to the Commission that any contract market or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, or is restraining trading in any commodity for future delivery, the Commission may bring an action in the proper district court of the United States or the proper United States court of any territory or other place subject to the jurisdiction of the United States, to enjoin such act or practice, or to enforce compliance with this chapter, or any rule, regulation or order thereunder ...

The standard for determining whether an injunction should be entered under these circumstances is that, once a violation has been found, there is a reasonable likelihood of future violations. *E.g., Commodity Futures Trading Commission v. Hunt,* 591 F.2d 1211 (7th Cir.), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979); *Commodity Trading Futures Commission v. Muller,* 570 F.2d 1296 (5th Cir. 1978). This determination is based upon the totality of the circumstances surrounding the defendant's violations.[33] Courts

---

**33.** *E.g., CFTC v. Hunt,* 591 F.2d 1211, 1220 (7th Cir.), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2848, 61

have generally considered the egregiousness of the defendant's action, the recurrent nature of the violations, the degree of scienter involved, the defendant's recognition of the wrongfulness of the conduct, and the likelihood of opportunities for future violations. E.g., *Commodity Futures Trading Commission v. Hunt, supra.*

■ Clearly Skorupskas' conduct indicates that she is likely to continue violating the Act. First, Skorupskas implemented a complex and extensive scheme of deceit which defaulted investors of millions of dollars. Second, she continued this wrongful conduct despite entering into a consent order which prohibited her activity. Third, substantial evidence established that she continued to act in contempt throughout these proceedings. Fourth, not only has Skorupskas made no effort to cooperate with the government or the Receiver, but she has actively hidden assets and documents from them. Fifth, Skorupskas has disseminated various fabrications about the plaintiffs, this action, and the Court. The only purpose for these tales is to maintain investor confidence so that she may continue her fraud. Moreover, she apparently has been largely successful in this regard; many of the investors who testified in Skorupskas' behalf were indoctrinated by her contrivances. Finally, Skorupskas' operation requires that funds be continually solicited or it will collapse.[34] Therefore, under these circumstances a permanent injunction is appropriate and will be entered in accordance with this opinion.

Second, courts have uniformly recognized that the authority granted by section 6c of the Act, 7 U.S.C. § 13a–1, permits courts to order the appointment of a permanent receiver, disgorgement, and restitution. E.g., *Commodity Futures Trading Commission v. Co Petro Marketing Group, Inc.*, 680 F.2d 573, 583 (9th Cir. 1982). In *Co Petro Marketing*, the court held:

We have little difficulty in finding 6c broad enough to authorize the appointment of a receiver, an order requiring that the receiver have access to the firm's books and records, and an order for an accounting. Section 6c authorizes the Commission to bring action to 'enforce compliance' with the Act and empowers the court to order 'such action as is necessary to remove the danger of violation.' ... Ancillary to the permanent injunction, the district court could have found that a receiver and an accounting were justified as a means of assuring that Co Petro would not go back into the futures business in violation of the injunction. Similarly, the order of disgorgement may serve to deter future violations. As the Supreme Court has noted in a similar context: 'Future compliance may be more definitely assured if one is compelled to restore one's illegal gains.' ...

Finally, we conclude that it would frustrate the regulatory purposes of the Act to allow a violator to retain his ill-gotten gains....

680 F.2d at 583–84. *See Commodity Futures Trading Commission v. Hunt, supra*, 591 F.2d at 1223 ("Thus we conclude that a district court may compel a violator of regulations promulgated under the trading limit provisions of the [Act] to disgorge his illegally obtained profits.").

■ Under the circumstances in this case, in order to protect the investors from further fraud, to deter such conduct in the future, and to prevent Skorupskas from benefitting any further from her deceit, the Court ORDERS that the freeze over defendants' assets continue, that the Temporary Receiver become a Permanent Receiver, that Skorupskas and her various entities disgorge any funds they have received from investors, and that these funds be returned to the investors. The Court directs the Receiver to determine the amount

L.Ed.2d 290 (1979) ("In drawing the inference from past violations that future violations may occur, the court should look at the totality of circumstances, and factors suggesting that the infraction might not have been an isolated occurrence are always relevant.").

34. *See supra* note 9 and accompanying text.

of Skorupskas' and her various corporations' assets which were obtained directly or indirectly from investors and to formulate a plan of distribution of those funds to investors.[35]

As to the acts in contempt of the Court Order, since the contempt proceedings were civil the Court has authority to impose both compensatory and coercive sanctions.[36] The Court possesses broad discretion in enforcing civil contempt and in fashioning sanctions.[37] It is well settled that courts may impose fines to compensate those injured by contemptuous acts.[38] Skorupskas, Gaughan, Andre Kliczak, Krystyna and Johannes Kliczak, and Algis Skorupskas all acted willfully in contempt of the Court Order by continuing to defraud investors with Skorupskas' pyramid operation. These acts resulted in hundreds of thousand dollars of additional funds wrongfully obtained from investors. Not only should these individuals be divested of any of these funds which are now in their possession or control, but they should also be required to repay the amounts lost by the investors. Therefore, the Court ORDERS that the following fines be imposed on these individuals as compensation for the injuries caused due to their contempt of Court:

(i) Skorupskas shall pay a fine equal to the amount of all funds obtained from investors since June 7, 1983, the date of entry of the Court Order, less the fines imposed upon the other individuals;

(ii) Gaughan shall be liable for the amount of investor funds attributable to the cruise to the Caribbean, his various travels and expenses, and half of the sum of the Receiver's costs caused by the investors' failure to properly fill out and return the Receiver's questionnaire;

(iii) Andre Kliczak shall be liable for an amount equal to the amount of funds contributed by Wisconsin investors since June 7, 1983; and

(iv) Krystyna and Johannes Kliczak, and Algis Skorupskas shall be liable for an amount equal to the amount of investor funds they personally retained.

Although the evidence at trial may be sufficient for the Court presently to fix exact dollar amounts for these fines, prudence suggests that these figures should be based upon the Receiver's final report. The Receiver is thus further charged to determine the amount of the above fines based upon the documentation available and submit his findings for the Court's review. These fines shall be paid to the Receiver who will distribute the funds to the investors based upon an approved plan of disbursement. This plan should attempt to reimburse an investor for amounts paid to Skorupskas' operation less any funds the investor received back. The plaintiffs, who are under the duty to protect the investors' and public's interest, shall aid the Receiver in seeking enforcement and satisfaction of these fines.

The Court has the authority to not only impose compensive fines but also sanctions designed to coerce compliance with its orders.[39] These coercive sanctions can be in the form of either conditional fines or terms of incarceration.[40] Further, civil contempt can be remedied by the imposition of both compensatory fines and coercive imprisonment. *E.g., In re Dinnan*, 625 F.2d 1146 (5th Cir.1980).

**35.** The Court is particularly concerned with windfall profits received by members of Skorupskas' family. The Receiver should consider whether efforts should be undertaken to retrieve some of such profits.

**36.** *E.g., United States v. United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947).

**37.** *See e.g., McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193–94, 69 S.Ct. 497, 500–01, 93 L.Ed. 599 (1948).

**38.** *E.g., United States v. United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *Sunbeam Corp. v. Golden Rule Appliance Co.*, 252 F.2d 467 (2d Cir.1958).

**39.** *E.g., United States v. United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *In re Dinnan*, 625 F.2d 1146 (5th Cir.1980). *See Winner Corp v. H.A. Caesar & Co.*, 511 F.2d 1010 (6th Cir.1975).

**40.** *Id.*

The June 7th consent Order ordered Skorupskas to:

> deliver over to the Temporary Equity Receiver appointed hereby during the pendency of this Order, and the equity receiver thereafter, to take into his immediate possession, custody and control all funds, property, premises and other assets of or in the possession or control of the defendants, including but not limited to, all books and records of account and original entry, all funds, securities, property, premises, bank and trust accounts and *other assets, of whatever kind and nature and wherever situated* ... (Emphasis supplied).

Since the entry of this Order Skorupskas has represented to investors on numerous occasions that she hid millions of dollars from the Receiver and the government "off shore." Although there is absolutely no evidence to suggest that these funds do exist "off shore," such funds would be subject to the Court Order if they exist and should be included in the receivership to be disbursed to the investors. By refusing to disclose the location of these funds to the Receiver and by representing the existence of these funds to solicit further investments, Skorupskas continues to act in contempt of the Court Order. Therefore, in order to enforce compliance of the Order the Court ORDERS that Skorupskas indicate in writing under oath to the Court the amount and location of these "off shore" funds; if the funds do not exist Skorupskas is hereby required to indicate that fact in writing under oath to the Court. If Skorupskas fails to indicate either the location and amount of these funds or that the funds do not exist within 14 days of the entry of this Order, then she is to be taken into custody by the United States Marshal and incarcerated until she complies. This remedy, although seemingly harsh is absolutely necessary to insure compliance with the Order, halt Skorupskas' fraudulent operations, and protect the public.

This decision hopefully ends this unfortunate episode. Unfortunate not simply because large amounts of money were gotten by deceit, but because these funds came from individuals who cannot readily afford the loss. Skorupskas' scheme was financed by the hard-earned savings of working class people, funds to buy a home, to further their children's education, and to assure a comfortable retirement. The impact of Skorupskas' and her associates' fraud will be harsh, even devastating.[41] This incident is also unfortunate because it was based on the trust, faith and loyalty of a group of working class people in one of its own, one who betrayed that trust, without any concern or remorse.

Plaintiffs are directed to submit a judgment in accordance with the foregoing.

---

**41.** Many of the investors testified that they invested most of their savings with Skorupskas. They further testified that the loss of this money could possibly cost them their homes, payment for their children's education, and their retire-ment plans. In fact, while this opinion was being drafted, the Court received letters and phone calls from investors seeking the release of funds for mortgage payments and the like.